IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | |
|---|---|
| DEBRA ANNE GARY, | * |
| Plaintiff, | * |
| vs. | * |
| | CASE NO. 4:03-CV-164(CDL) |
| GEORGIA DEPARTMENT OF HUMAN RESOURCES, WEST CENTRAL GEORGIA REGIONAL HOSPITAL, | * |
| | * |
| Defendants | * |

O R D E R

This lawsuit arises from the termination of Plaintiff's employment based upon Defendants' conclusion that she was not able to perform the essential functions of her job due to her physical limitations. Plaintiff contends that Defendants' actions amounted to unlawful disability discrimination, and she brings claims under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Defendants now move for summary judgment on Plaintiff's claims. Defendants also move to strike as untimely Plaintiff's affidavit filed in opposition to Defendants' Motion for Summary Judgment. For the reasons set forth below, Defendants' Motion for Summary Judgment (Doc. 66) is granted, and Defendants' Motion to Strike (Doc. 80) is granted.

DEFENDANTS' MOTION TO STRIKE

On or about September 7, 2005, Plaintiff[1] submitted an affidavit, accompanied by nineteen exhibits, in support of her response to Defendants' summary judgment motion. However, the affidavit was submitted more than three months after Defendants filed their Motion

---

[1] Plaintiff in this case is proceeding pro se.

for Summary Judgment on May 20, 2005 and approximately two months after Plaintiff timely filed (within the Court-granted extension) her response to Defendants' Motion for Summary Judgment on July 7, 2005. Defendants timely filed their reply to Plaintiff's response on July 22, 2005. Under Fed. R. Civ. P. 56, M.D. Ga. R. 7.2, and M.D. Ga. R. 56, a respondent to a summary judgment motion must file her response and any supporting affidavits within twenty days after service of the movant's motion and brief. Plaintiff's September 2005 affidavit was clearly submitted outside that time-frame and outside the extension granted by the Court. Because Plaintiff filed no additional motion to extend the deadline for responding to Defendants' motion and because she made no affirmative showing that her untimely filing was the result of excusable neglect, the Court refuses to consider Plaintiff's untimely affidavit. *See* Fed. R. Civ. P. 6(b); *see also Useden v. Acker*, 947 F.2d 1563, 1571 (11th Cir. 1991). The Court notes that the content of the affidavit is not "newly discovered evidence extracted from a previously missing source." *Id.* Rather, it is Plaintiff's own affidavit, which generally reiterates the same points Plaintiff made in her statements of fact submitted in response to Defendants' summary judgment motion and refers to nineteen exhibits that had all been submitted to the Court by Plaintiff or Defendants in support of previous filings. Therefore, the affidavit appears to be meant as a sur-reply to Defendants' reply to Plaintiff's response. The Court previously denied Plaintiff's motion for leave to file a sur-reply brief. For these reasons, the Court grants Defendants' Motion to Strike and shall not consider Plaintiff's September 2005 affidavit in ruling on Defendants' Motion for Summary Judgment.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants are entitled to summary judgment if after construing the evidence in the light most favorable to Plaintiff and drawing all justifiable inferences in her favor, no genuine issues of material fact exist to be tried. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Plaintiff may not simply rely upon her Complaint to create a genuine issue of material fact—she must go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," point the Court to specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Although the Court must view factual inferences in favor of Plaintiff, Plaintiff still must meet her burden of establishing that there is a genuine issue of material fact for trial. *See Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Construing the record in the light most favorable to Plaintiff reveals the following.

FACTUAL BACKGROUND

Plaintiff was employed as a registered nurse at Defendant West Central Georgia Regional Hospital ("WCGRH") from March 2001 until October 2002. During her employment at WCGRH, Plaintiff worked the third shift on the Adolescent Stabilization Transitional Unit ("ASTU"), a 20-bed long-term residential treatment facility for adolescents. ASTU patients are between 13 and 17 years of age and have been diagnosed with some type of severe emotional disturbance, such as explosive conduct disorder or depression.

In November 2000, prior to her employment with WCGRH, Plaintiff suffered a back injury while working as a registered nurse at

St. Francis Hospital. At the time of her injury, Plaintiff experienced pain and had trouble dressing herself, bathing herself, walking, standing, and sitting. Due to that injury, Plaintiff sought medical treatment and chiropractic care. With this treatment, Plaintiff's situation improved so that she was "able to function," and although she continued to experience pain, she was able to bathe herself, dress herself, stand, walk, sit, drive, and lift things over zero pounds. After the injury, Plaintiff was unable to work for a period of time, but effective February 26, 2001, her doctor released her to return to work with the following work restrictions: no prolonged sitting or standing, no pushing, no pulling, no bending, and no lifting over zero pounds. Plaintiff continued to seek medical and chiropractic treatment after she received those work restrictions.

Plaintiff applied for employment with WCGRH in late February 2001, and she began her employment as a registered nurse on the ASTU in March 2001.[2] It is undisputed that Plaintiff's job as a registered nurse on the ASTU required Plaintiff to assess and monitor patients and respond to emergency situations. These job functions included a variety of tasks, including making rounds to update information in patient charts, dispensing medications and juice to patients, giving shots to patients, making rounds with a flashlight to determine if patients were breathing as they slept, and responding to "Code Blues" (medical emergencies, such as heart attacks and seizures), "Code

---

[2] Although some WCGRH personnel knew of Plaintiff's *injury* when she began her employment, it is not clear that they knew of her *restrictions*. When Plaintiff began her employment, she indicated that she had no restrictions that would affect her ability to perform her job.

4

Reds" (fire situations), and "Code Stresses" (situations where patient engages in disruptive behavior, often fighting; on the ASTU, there are approximately seventy-five "Code Stresses" in a six month period).[3]  Although the ASTU has health service technicians ("HST") to perform some of the physical tasks on the unit, if an HST is unavailable, a nurse must perform the functions of an HST, such as physically assisting a patient with routine daily activities or physically responding to emergency situations.  While Plaintiff worked on the ASTU, the unit was short-staffed, and it was not uncommon for there to be only one nurse on Plaintiff's shift.

After she started her employment with WCGRH in March 2001, Plaintiff was absent from work a few times due to back pain.  She presented WCGRH with doctors' excuses[4] for those absences, and those excuses placed work restrictions upon Plaintiff's activity, including restrictions on prolonged sitting or standing, pushing, pulling, and lifting over zero pounds.[5]  Until June 4, 2002, there was no

---

[3] Plaintiff's response to emergency situations was apparently restricted to calling for help.  Based on her work restrictions and on her own perception of her abilities, Plaintiff was unable to physically intervene during some of these emergency situations.  Plaintiff testified that when she needed to call a Code Stress, she would wait behind a secured door or in the bathroom until other staff responded.

[4] The record contains four such excuses:  May 24, 2001 (Dr. Emory Alexander); April 16, 2002 (Dr. Emory Alexander); June 4, 2002 (Dr. Emory Alexander); June 5, 2002 (Chiropractor Marcus Edwards).

[5] In addition to the doctors' evaluations, Plaintiff had a functional capacity evaluation (FCE), an assessment of her physical capabilities, in May 2002.  Plaintiff relies on the FCE in support of her contention that she was disabled when she worked for WCGRH.  According to the FCE, Plaintiff was classified at the "No Classification" physical demand level and could work full time if she was not required to carry more than five pounds occasionally or push more than fifteen pounds occasionally and if she was never required to bend, squat, kneel, or lift more than zero pounds.

indication on the excuses that these restrictions were permanent. However, the doctor's excuse from Dr. Emory Alexander dated June 4, 2002 listed the following "permanent" work restrictions: no pushing, no pulling, no lifting anything over zero pounds, and no "take-downs."[6]  In October of 2002, Plaintiff's supervisor, Myra Hester, forwarded the June 4 doctor's excuse listing these permanent work restrictions to Rick Garcia, ASTU's director.[7]  After reviewing the June 4 excuse, Garcia asked Plaintiff to provide updated information about her condition and the accompanying work restrictions. Plaintiff did not see Dr. Alexander about lifting the work restrictions, and she contends that she had already provided an "updated excuse" dated June 5, 2005:  this excuse was from Plaintiff's chiropractor and still restricted Plaintiff from lifting and bending, though it did not indicate that those work restrictions were permanent.  Even considering this "updated excuse," Plaintiff did not provide any information to Garcia indicating that the work restrictions were lifted, and she did not request any accommodations. Given the job functions of a registered nurse on the ASTU, Garcia believed that Plaintiff could not perform her job under the doctors' work restrictions.  Therefore, Garcia recommended that Plaintiff's employment with WCGRH be terminated.  Plaintiff's employment was terminated on October 29, 2002.  Plaintiff brings claims under

---

[6] If an ASTU patient is involved in disruptive behavior, such as fighting, it may be necessary for nurses and other ASTU personnel to have physical contact with the patient to restrain or help the patient.  Such contact is called a "take-down."

[7] There is no explanation as to why the excuse was not brought to Garcia's attention earlier.  However, it is undisputed that Garcia was unaware of the excuse until October of 2002 and that Garcia was unaware of when the excuse was brought to WCGRH.

Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Rehab Act"), alleging that she was wrongfully terminated from her employment at WCGRH because of a disability.

## DISCUSSION

Section 504 of the Rehab Act prohibits recipients of federal financial assistance from discriminating against otherwise qualified individuals with a disability. 29 U.S.C. § 794. To establish a prima facie case of discrimination under the Act, Plaintiff must show that "(1) she has a disability; (2) she is otherwise qualified for the position; and (3) she was subjected to unlawful discrimination as the result of his disability." *Sutton v. Lader*, 185 F.3d 1203, 1207-08 (11th Cir. 1999). Defendants contend that Plaintiff was not "otherwise qualified for the position."[8]

To be "otherwise qualified" for a position, an individual must be able to meet the essential functions of the job in question, with or without reasonable accommodation. 45 C.F.R. § 84.3(l) (2005); *Sch. Bd. of Nassau County v. Arline*, 480 U.S. 273, 288 n.17 (1987); *see also Sutton*, 185 at 1210 (citing 29 C.F.R. § 1630.2(m), an Equal Employment Opportunity Commission regulation interpreting the

---

[8] In the alternative, Defendants argue that Plaintiff was not disabled when she worked for WCGRH. Because Plaintiff was not "otherwise qualified" for the registered nurse position, the Court does not reach this question but notes that it is doubtful that a jury could find that Plaintiff was substantially limited in one or more major life activities due to her back injury or that she had a record of or was regarded as having such an impairment. *See* 29 U.S.C. § 706(8)(B); *see also Sutton*, 185 F.3d at 1208. Plaintiff testified in her deposition that after she received medical and chiropractic treatment for her back injury, she was "able to function"—she was able to bathe herself, dress herself, walk, sit, drive, and lift things over zero pounds. She also stated that she was able to do her job at WCGRH, which involved walking, caring for her patients, and performing a number of other tasks, including updating patient charts, dispensing medication to patients, and giving shots to patients.

Americans with Disabilities Act). To determine whether an individual is able to perform the essential functions of the job, the courts consider the following types of evidence: the employer's judgment as to which functions are essential; written job descriptions; the amount of time spent performing the functions; and the consequences of not requiring the individual to perform the function. *See D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1230 (11th Cir. 2005) (applying factors listed in EEOC regulations interpreting the Americans with Disabilities Act); *see also* 29 C.F.R. § 1630.2(n)(3) (2005); 41 CFR § 60-741.2(u)(3) (2005).[9] Furthermore, a job function may be considered essential (i) "because the reason the position exists is to perform that function"; (ii) "because of the limited number of employees available among whom the performance of that job function can be distributed"; or (iii) because the function is "highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function." 29 C.F.R. § 1630.2(n)(2); 41 CFR § 60-741.2(u)(2).

In this case, Defendants have presented evidence, in the form of testimony by the director of the ATSU and in the form of written job descriptions and procedure manuals, that essential job functions of a registered nurse on the ATSU included updating patient charts, dispensing medication to patients, making rounds to check on

---

[9] The Court notes that these factors are derived from Equal Employment Opportunity Commission regulations interpreting the Americans with Disabilities Act ("ADA") and from Department of Labor regulations interpreting § 793 of the Rehab Act (concerning employment under federal contracts). Nonetheless, the Court views the factors as persuasive and thus applies them in this case. Both regulations construe the term "essential functions," which is used identically in cases and regulations interpreting the ADA, § 793 of the Rehab Act, and § 794 of the Rehab Act to define the term "qualified individual."

8

patients, and physically responding to emergency situations, such as "Code Blues" and "Code Stresses." Plaintiff concedes that most of these were essential functions of her job and recognizes that even some of those which she admits as essential functions necessarily involved tasks that were proscribed by her doctors and indicated in the FCE as beyond Plaintiff's physical ability (e.g. lifting more than zero pounds). Generally, an employer is not required to allow an individual to perform work she has not been medically cleared to do. *See Sutton*, 185 F.3d 1210. Because Plaintiff was not medically cleared to do some of her essential job functions, the Court cannot find that she was qualified to be a registered nurse on the ASTU.

Even if the Court does as Plaintiff urges and ignores the doctors' restrictions and the portions of the FCE detailing Plaintiff's physical ability and considers only the physical limitations Plaintiff concedes she had, Plaintiff was still not "otherwise qualified" to be a nurse on the ASTU because she could not physically respond to some emergency situations. Plaintiff argues, however, that it was not an essential function of her job to *physically* respond to emergency situations because there were HSTs and other staff to do it.

Plaintiff admits that due to her back injury, she would not physically intervene during some emergency situations. For example, Plaintiff testified that when she needed to call a Code Stress, she would wait behind a secured door or in the bathroom until other staff responded. Plaintiff insists that calling others to respond—rather than physically responding herself—was sufficient to satisfy the essential function of emergency response. However, Plaintiff has presented no evidence to rebut Defendants' evidence that *all*

registered nurses on the ASTU were trained to respond to emergency situations and expected to be able to perform the physical functions because the nature of the ASTU, including the types of emergencies encountered and the ASTU's staff shortage, required that all hands be able to physically respond to an emergency.  WCGRH's procedures make clear that nurses must be able to perform some physical activities during emergency responses and that patient health and safety depends upon the staff's ability to respond quickly to emergencies.  For example, during a "Code Blue," the first responding registered nurse must perform time-sensitive emergency measures, such as cardiopulmonary resuscitation, the Heimlich maneuver, automated external defibrillator, or first aid.  And during a take-down, a nurse is expected to be able to function as a distractor (who is responsible for holding the patient's legs once the patient is taken to the floor), a contact initiator (who must fall to the floor with the patient and hold patient on the floor), or a support person (who must hold the patient's arms away from the patient's body and mouth).  All of these emergency response activities require lifting, pushing, and/or pulling.

   Plaintiff offers a "no harm, no foul" argument in support of her contention that physically responding to emergency situations was not an essential function of her job.  This argument focuses on the fact that nothing bad happened on the ASTU due to Plaintiff's inability to respond physically in emergency situations.  According to Plaintiff, there were never any take-downs when she was the lone nurse, nor was there ever an emergency situation that could not wait for other staff to respond.  Even if that is true, it does *not* prove that Plaintiff was "qualified" to be a registered nurse on the ASTU.  If anything,

it shows that Plaintiff was lucky that no one was hurt due to her inability to respond to emergencies, particularly given the fact that emergency situations threatening the health and safety of patients are not at all uncommon on the ASTU.

For the foregoing reasons, it is clear that being able to physically respond to emergencies was an essential function of Plaintiff's job.  Plaintiff's suggested solution—accommodating Plaintiff by allowing her to refrain from physically responding to emergencies and requiring others to respond for her—is untenable.[10] An employer is not required to reallocate essential functions.  *See Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1527-28 (11th Cir. 1997).  Because Plaintiff admitted that she was unable to physically intervene during some emergency situations and because ability to physically respond during emergencies was an essential function of her job, Plaintiff was not qualified to be a registered nurse on the ASTU.  Therefore, she cannot establish a prima facie case under the Rehab Act, and Defendants are entitled to summary judgment.

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' Motion for Summary Judgment (Doc. 66) and Motion to Strike (Doc. 80).

IT IS SO ORDERED, this 3rd day of November, 2005.

S/Clay D. Land
CLAY D. LAND
UNITED STATES DISTRICT JUDGE

---

[10] Even if this accommodation *were* reasonable, it is undisputed that Plaintiff never requested any accommodations from WCGRH.